UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

STEPHANIE BURRESS,

      Plaintiff,

      v.

SPRING GROVE CEMETARY
& ARBORETUM, *et al.*,

      Defendants.

Case No. 1:18-cv-879
JUDGE DOUGLAS R. COLE

## OPINION AND ORDER

This cause comes before the Court on Spring Grove Cemetery and Arboretum, Funeral Centre Agency, LLC, and Spring Grove Funeral Homes, Inc.'s (collectively "Spring Grove" or "Defendants") Motion for Summary Judgment. (Doc. 20). For the reasons more fully discussed below, the Court **GRANTS** Spring Grove's Motion for Summary Judgment (Doc. 20) and **ORDERS** the Clerk to terminate the case.

## BACKGROUND[1]

### A.    Spring Grove Hired Burress As A Family Sales Advisor In 2013, And She Worked There Successfully For Several Years.

Spring Grove Cemetery and Arboretum, along with its two sub-entities— Funeral Centre Agency, LLC, and Spring Grove Funeral Homes, Inc.—operates a

---

[1] The Court cannot entirely rely on the parties' proposed statements of undisputed facts. That is because Burress did not follow either Judge Black or Judge Cole's standing orders. (This case had been reassigned from Judge Black to Judge Cole a few days before Burress filed her opposition to the motion for summary judgment.) Instead, "[w]ithout waiving his position that Judge Black's Standing Order does not apply to this action now before Judge Cole," Burress's counsel submitted his own hybrid document where he: (1) generally objected to Spring Grove's facts because they were "lengthy" and "argumentative," among other reasons; (2) listed his responses to each of Spring Grove's Proposed Undisputed Facts as merely "admit," "object," "deny," or "object/deny," without further explanation or citation; and then

cemetery in Cincinnati, Ohio. (Defs.' Proposed Undisputed Facts, ¶¶ 1–2, Doc. 20-1, #625). Spring Grove prides itself on celebrating the ethnic diversity of Cincinnati by offering various options to meet the special religious and cultural traditions of the families it serves. (*Id.* at ¶ 3). Key to Spring Grove's goal of meeting its families' needs is the position of Family Sales Advisor. Spring Grove hired Stephanie Burress ("Burress" or "Plaintiff") to serve as a Family Sales Advisor in 2013. (*Id.* at ¶ 4). In that role, Burress sold burial plots, burial services, memorialization (i.e., monuments and headstones) before or after a customer's death, and life insurance policies designed to pay for funeral expenses. (*Id.* at ¶ 5, #626).

Burress's coworkers considered her good at her job. Her immediate supervisor, Keith Koma, found her to be hard-working, reliable, and honest. (Koma Dep., Doc. 24, #756). Pam Deshler, a Family Service Manager, thought Burress was an "excellent employee" who "took wonderful care of the families" and was "definitely a high producer[.]" (Deshler Dep., Doc. 18, #574). Michael Burke, the Vice President of Sales and Marketing (Burress's department), likewise thought Burress was "a very good sales advisor[.]" (Burke Dep., Doc. 17, #529). Burress worked at Spring Grove without incident until 2015.

---

(3) submitted generally that "the disputed issue of material fact to be tried to determine liability is whether Plaintiff's employment would have been terminated had she not engaged in 'protected conduct.'" (*See* Pl.'s Obj. & Resp. to Defs.' Proposed Undisputed Facts & Pl.'s Statement of Proposed Disputed Issues of Material Fact, Doc. 28-1, #904–07). Both parties did, however, attach multiple depositions to their briefing. To the extent Burress objects to Spring Grove's Proposed Undisputed Facts, the Court instead pulls the facts from other parts of the record.

**B. In 2015, Spring Grove's CFO Allegedly Acted In A Sexually Inappropriate Manner Towards Burress, And Burress Claims She Reported The Incident To Her Supervisor.**

Sometime in October 2015, Burress claims Spring Grove's CFO, David Kelley, invited Burress out to dinner after work. (*See* Burress Dep., Doc. 13, #110). Kelley does not generally dispute this point; he remembers going out to dinner with Burress a couple of times. (Kelley Dep., Doc. 25, #821–22). Burress and Kelley also agree the pair had a few drinks while at these dinners. (*See* Burress Dep. at #119; *see also* Kelley Dep. at #822–26). Kelley vehemently disagrees, however, with Burress's recollection of what happened after dinner in particular. Burress claims that, after the two had some drinks, Kelley shared that he and his wife were no longer having physical relations and his wife was unhappy. (*See* Burress Dep. at #130–31). Burress claims she suggested he should pay more attention to his wife. (*Id.* at #130). Kelley then allegedly alluded to the fact that he had the house all to himself at the time because his wife was out of town with his son. (*Id.* at #130–31). Burress claims Kelley continued to go into detail about his relationship with his wife and how he was unhappy, too. (*Id.* at #131). Burress claims she felt uncomfortable with the conversation, but felt like she handled it well. (*Id.*). When Burress left for the evening, Kelley purportedly gave her "an uncomfortable hug." (*Id.*). But Burress "blew it off" and "patted him back." (*Id.*).

"And then," according to Burress, "the text messages started." (*Id.*). In particular, Burress claims she exchanged seven or eight text messages with Kelley that evening. (*Id.* at #132). In those messages, Kelley allegedly told Burress that he wanted her to "come over and be with him at his house while his wife was gone." (*Id.*).

He proceeded to send text messages stating things like "I've got the whole house to myself[,]" "[c]ome over[,]" "I've always been attracted to you[,]" and "I love your eyes." (*Id.* at #134). While Kelley was trying to talk her into coming over, Burress tried to "blow him off" gently so that he would not get mad at her and "potentially retaliate," since he is in senior management at the company. (*Id.* at #133).

That same evening, Burress allegedly discussed the incident with two people—Keith Koma, her immediate supervisor, and Jennifer MacLean, a friend at work. (Burress Dep. at #132–33). In a text exchange with Koma, Burress claims she told him that Kelley had put her "in a very awkward situation and had made sexual advances" towards her. (*Id.* at #119). Burress thought Koma did not believe her, so she sent him screenshots of Kelley's text messages. (*Id.*). Burress claims that Koma then apologized for not believing her and said Kelley's actions were inappropriate. (*Id.*). He asked what Burress wanted him to do about it. (*Id.* at #120). Koma told her he would report it to Human Resources. (*Id.*). But Burress testified that Koma did not, in fact, do so. (*Id.*). And neither did she, (*id.*), partly "because [she] feared retaliation[.]" (Decl. of Stephanie Burress ("Burress Decl."), ¶ 5, Doc. 27-1, #884). Separately, Burress claims that Koma told her that regardless of whether he reported it to Human Resources, he "was going to report it to Deshler." (*Id.* at ¶ 3). That did not surprise Burress, as Koma had "often told [Burress] that he shared everything with Deshler."[2] (*Id.*). Burress does not claim, though, that Koma ever told her he had in fact done so.

---

[2] Deshler herself denies knowing about the incident until after Burress filed charges with the EEOC. (Deshler Dep. at #590–91).

Burress also contends she sent the screenshots to MacLean. Burress says that MacLean said something like "seems about right" and was not shocked by Kelley's behavior. (Burress Dep. at #156). Burress and MacLean did not discuss the situation any further. (*Id.*). Neither Burress nor Spring Grove submitted any testimony nor an affidavit from MacLean regarding these alleged events.

Burress testified that Kelley requested a meeting with Burress first thing the following morning. (*Id.* at #120–21). She says he apologized for his actions. (*Id.* at #121). After this incident, Burress did not have any other negative interactions with Kelley up through the time she was terminated some eighteen months later, in the Spring of 2017. (*Id.* at #110).

## C. The Following Year, In 2016, Spring Grove Reprimanded Burress For Workplace Conduct Issues.

In June of 2016, about nine months after her alleged dinner with Kelley, Spring Grove disciplined Burress for acting inappropriately toward a coworker. Specifically, Spring Grove determined that Burress made inappropriate sexual comments and a vulgar gesture in the public reception area that offended one of her coworkers. (Brown Dep. at #324–28). A formal report of the incident was created on June 20, 2016, but Burress contests the accuracy of that report. (Burress Dep. at #136). She allegedly told Burke, the Vice President of her department, that she did not believe her comments were sexual in nature, and that the only part of the formal report with which she agreed was that she had shot rubber bands across the public foyer. (*Id.* at #136–37).

5

Because of this incident, Spring Grove required Burress to participate in Spring Grove's employee assistance program ("EAP"). (*See id.* at #137–39; Brown Dep. at #328–33). The EAP provides specialized assistance to employees on a wide range of matters, including personal, drug and alcohol related, and work-performance related matters. (Brown Dep. at #329). Mark Brown, Spring Grove's Vice President of Human Resources, directed Burress to contact EAP so she could receive "mentoring and coaching" to better determine "what is appropriate behavior in a workplace." (*Id.*).

**D.      The Year After That, Another Coworker Accused Burress Of Making Racially Inappropriate Comments.**

Ten months later, in April 2017, Burress again found herself in hot water for alleged workplace misconduct. A coworker, Cheryl Douthitt, an African American woman who works in accounts receivable, accused Burress of making racially inappropriate comments towards her. (*See* Douthitt Dep., Doc. 14, #226, 231–35). Douthitt claims she never knew Burress personally, and viewed her more as a coworker than a friend. (*Id.* at #227–29). Burress, on the other hand, was taken aback by the accusation because she thought she and Douthitt were friends and did not think Douthitt was offended by Burress's comment. (Burress Dep. at #93–94, 105).

The allegations stem from an incident in the kitchen at Spring Grove on the afternoon of April 25, 2017. Douthitt visited the office kitchen to retrieve an ice cream bar from the freezer. (Douthitt Dep. at #231). Burress and Jeanette Humphries, another Spring Grove employee (both Caucasian women), were already there. (*Id.*). When Douthitt opened the ice cream bar package, she cut her finger on a staple. (*Id.*

6

at #231–32). Burress started laughing and told Douthitt she should sue the company. (*Id.* at #232). Humphries objected, bantering that Douthitt should not sue the company because they are "nice people" who provide workers with ice cream. (*Id.*). Burress then said no, "I'm not talking about that – the ice cream company, I'm talking about the Band-Aid company." (*Id.*). Explaining more fully, Burress suggested Douthitt sue the Band-Aid company because "they don't make black Band-Aids." (*Id.*). Douthitt was thrown off by the comment. (*Id.* at #233). Before she could respond, Burress persisted, "no, seriously, seriously, you need to sue the Band-Aid company because they don't make black Band-Aids. I mean, you do bleed, don't you?" (*Id.*). Burress claims Douthitt "laughed and [it] didn't seem like it bothered her." (Burress Dep. at #93). Douthitt, on the other hand, said she was offended. "It hurt my feelings [] really bad[,] … it wasn't a joking matter, and it sure wasn't funny," Douthitt said. (Douthitt Dep. at #233). "[I]t humiliated me." (*Id.* at #234).

Later that day, Douthitt says she spoke with Humphries about the incident. Humphries said she "didn't know what to say." (*Id.* at #248). Humphries allegedly told Douthitt that the situation made her uncomfortable, too. (*Id.* at #249). In response to an inquiry from Douthitt on what to do next, Humphries suggested that if Douthitt was really bothered by Burress's comments, Douthitt should speak with Douthitt's supervisor about the situation. (*Id.* at #248).

Douthitt took Humphries' advice and reported the incident to her supervisors. (*Id.* at #249). She first spoke with Liz Hagedorn, her direct supervisor, who in turn called in Pam Deshler, one of Burress's managers. (*Id.*). Douthitt told the pair what

happened, and Deshler suggested that Douthitt could report the incident further to Brown, the VP of Human Resources, if she wished. (*Id.* at #251). Douthitt also told David Kelley, Spring Grove's Chief Financial Officer and another one of her supervisors, about Burress's comments. (*Id.* at #264–65). She told Kelley that she planned to visit Brown to discuss the incident. (*Id.* at #264). Douthitt could not remember whether Kelley then walked her down to Brown's office or if instead Kelley also actually sat in on the meeting with her and Brown, although contemporaneous records show Kelley being present. (*Id.* at #265; *see also* Brown Dep. Ex. 15, Doc. 16-3, #417). Either way, it is undisputed that on April 27, 2017, Douthitt disclosed the incident to both Brown and Kelley. (Doc. 16-3 at #417). At the meeting with Brown (which Kelley may have attended), after hearing what Douthitt had to say, Brown requested that she provide a written statement, which she did. (Douthitt Dep. at #257; *see also* Douthitt Dep. Ex. 10, Doc. 14-1, #281). Brown (who says Kelley was present) says Kelley did not speak during this meeting. (Brown Dep. at #336).

**E.    Spring Grove Investigated The Incident, Meanwhile Burress Believes She Is Being Targeted For Reporting The CFO's Alleged Sexual Harassment.**

Later that same day, April 27, Brown (VP of Human Resources) and Deshler (Burress's supervisor) met with Burress to discuss the incident that had occurred with Douthitt. (*See* Brown Dep. at #338; Doc. 16-3 at #417; Burress Dep. at #96). The meeting lasted about five minutes. (Brown Dep. at #340). Brown asked Burress for her recollection of the events, but Burress "was not very forthcoming with any information initially." (*Id.*). She instead "brought up an incident that happened that

8

[she] felt was relevant[] that involved upper management." (Burress Dep. at #102). Though she did not make it clear at the time, Burress now asserts that she was referring to the 2015 incident with Kelley, and that she thought that incident may be relevant to the present situation; mainly because Kelley was Douthitt's boss. (*Id.* at #102–03).

Beyond noting that there was an "incident," though, and that the incident "involved upper management," Burress did not reveal any further details about the alleged incident at the meeting—that is, Burress concedes that she did not say who the incident involved, nor what the alleged nature of the incident was. Burress says she "was not able to," as Brown "wouldn't let [her] talk to him about that at that time. [She] asked, who do I go to with these issues. You're the only person in HR that I can talk to about this." (*Id.* at #107). But Brown "didn't give [her] any indication that he was going to allow [her] to speak about it, so [she] didn't." (*Id.*). Brown then told Burress they were going to investigate further the facts surrounding her allegedly insensitive comments to Douthitt, and, in the interim, Burress would be suspended without pay. (*Id.*). Burke was not present at this meeting because he was away on vacation. (Defs.' Proposed Undisputed Facts at ¶ 21, #628).

At this point, Burress "suspected her unpaid suspension had been prompted, at least in part, by her stated opposition to Kelley's sexually harassing behavior" some eighteen months earlier. (Pl.'s Memo. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Memo. in Opp'n"), Doc. 28, #892). Burress was suspicious because Kelley unfriended her on Facebook, (*see* Burress Decl. at ¶ 8, #885), and now someone Burress thought

was her friend, and who also happened to be Kelley's subordinate, had lodged this complaint against her. (*See* Pl.'s Memo. in Opp'n at #892).

A few days later, on May 2, 2017, Brown, Burke, Deshler, and Burress met again to discuss the incident. (Brown Dep. Ex. 15, Doc. 16-3, #417). Burress claims she pressed Brown to explain why Douthitt had been offended by her joke. (Burress Decl. at ¶ 10, #885). Brown refused. She requested an opportunity to apologize to Douthitt. (*Id.* at #885–86). Brown again refused, but provided no explanation. (*Id.* at #886). "Brown's unwillingness to allow Plaintiff to apologize to Douthitt … reinforced [her] belief that her suspension was the result of her having rejected Kelley's advance and complaining about it." (Pl.'s Memo. in Opp'n at #893).

Brown, on the other hand, recounts a slightly different story. He says Burress started the meeting by apologizing, but, as the meeting continued, "became angry and started to question [them] as to why she was even in trouble." (Brown Dep. at #351). "So it went from an apology in the beginning to, I can't believe I'm in trouble for this, this is crazy." (*Id.*). Brown thought Burress was sorry, but that "she was not willing to take accountability for her actions." (*Id.*). Burke and Deshler agreed. (*See* Burke Dep. at #523–34; Deshler Dep. at #567–68).

Burress mentioned Kelley's name "once or twice" during this meeting. She said that Kelley and Brown "had it in for her," but did not provide any further context. (Burke Dep. Ex. 31, Doc. 17-1, #549; Burke Dep. at #519–20). When Brown heard this accusation, Burress claims he got red faced and angry, and prevented her from discussing it further. (Burress Dep. at #105). He supposedly became "very angry" with

10

Burress and told her "it had nothing to do with Dave Kelley, that it was [Burress] that was in trouble." (*Id.*). Burress did not provide any detail about her allegations against Kelley, besides simply mentioning his name. (*Id.* at #106).

While Burress did not provide any details, no one else in the room thought to ask. (*See* Deshler Dep. at #568–69, 571; Burke Dep. at #520–22). Burke testified that he had no idea why Burress brought up Kelley. (Burke Dep. at #521). Deshler, on the other hand, testified that she never thought to ask Burress to explain because the comment "came out of right field." (Deshler Dep. at #568–69). Brown, for his part, said the comment "[t]otally confused me." (Brown Dep. at #370). He simply thought Burress was talking about Kelley because Kelley was Douthitt's manager. (*Id.*).

At the end of this meeting, Brown told Burress that she would remain on unpaid suspension until Friday, May 5, 2017. (Brown Dep. Ex. 15, Doc. 16-4, #418). Brown claims the group had not made an official decision on Burress's continued employment at that point, "[b]ut the consensus was the meeting did not go well." (Brown Dep. at #373).

## F. Spring Grove Ultimately Fired Burress.

The next day, on May 3, 2017, Burress emailed Brown, copying Deshler, Burke, and Freytag, to express her frustration with the previous day's meeting. (*See* Doc. 16-4, #418–19). In the email, she said she "brought up serious HR issues [she] felt were relevant to the situation" during their May 2 meeting, but was "quickly and rudely shut down." (*Id.* at #419). She claimed Brown did not "even bother to listen." (*Id.*). "If I can't go to you with my issues, where am I to turn?" she questioned, (*id.*), but she

11

still did not elaborate on what those "serious HR issues" allegedly were. (*See id.*). She then continued to explain how she did not understand how Douthitt was offended by her comments regarding the Band-Aids, and how she felt the situation had been "completely and totally blown out of proportion." (*Id.*). She accused Brown of "basically [] looking for a reason" to fire her. (*Id.*).

Burke says the group—Brown, Deshler, and himself—reconvened after receiving Burress's email. (Burke Dep. at #530–31; *see also* Deshler Dep. at #589–90). He did not remember the exact words they used, but he knew they were all "pretty convinced that [they] could not continue with Stephanie in [their] employment." (Burke Dep. at #532). He said the group never considered options other than termination, but he felt the severity of Burress's actions warranted that further action. (*Id.* at #534). Burke did not believe unpaid suspensions would fix the problem. (*Id.* at #535–36).

Deshler and Brown echoed those concerns. Deshler thought Burress continued to deflect blame and felt strongly that Burress would make similar comments in the future. (*See* Deshler Dep. at #567, 574–76, 586–87). She ultimately recommended Burress's termination because Burress "was not tak[ing] ownership" of her actions, "kept deflecting," and "failed to understand the severity of her comments." (*Id.* at #590). Brown maintained that Burress's attitude and lack of accountability was the reason he also recommended termination. (Brown Dep. at #390). And despite the fact that Burress felt otherwise, Brown considered her comments to be a violation of Spring Grove's harassment policy. (*Id.* at #391).

Brown spoke with Spring Grove's CEO, Gary Freytag, before making the final decision. (*See* Brown Dep. at #377; Freytag Dep. at #681–82). Freytag felt concerned that Burress had referred to "serious HR issues." (Freytag Dep. at #682). Freytag testified that he was also concerned with the report in Burress's email that Brown had quickly and rudely shut down further conversation on the subject. (*Id.*). Freytag says he inquired of Brown as to what those serious HR issues were, but says that Brown told him Burress mentioned no specifics, and that Brown had no idea what Burress was talking about. (*Id.*). Although Freytag was concerned about what this undisclosed "serious HR issue" might be, he trusted Brown's judgment and agreed that termination was the best course of action. (*Id.* at #684–85).

Ultimately, Brown and Burke called Burress and informed her she was fired. (Brown Dep. at #390). The call lasted about thirty seconds. (*Id.*). Burress said in response, "you'll be hearing from my lawyer." (*Id.*).

And that they did. In October 2017, Burress filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). In that charge, Burress accused Kelley of propositioning her for sex. Brown says he first became aware of these allegations when he read the charges. (*Id.* at #380–81). Likewise, Deshler and Burke claim that they were unaware of Burress's sexual harassment allegations against Kelley until they read, or heard about, the EEOC charges. (*See* Burke Dep. at #540–41; Deshler Dep. at #590–91). Even after finding out about the EEOC charges, though, Brown states he never investigated Burress's allegations. (*See* Brown Dep. at #381–85).

A little over a year later, on December 17, 2018, Burress filed the instant lawsuit. (*See* Compl., Doc. 1, #1–11). She claims Spring Grove fired her in retaliation for complaining about Kelley's unwanted sexual advances. (*Id.* at ¶¶ 42–45, #6). She also sued Spring Grove for sex, race, and color discrimination under federal and state law. (*See id.* at ¶¶ 46–57, #6–8). She amended her complaint on August 6, 2019, adding some factual allegations, but leaving the causes of action unchanged. (*See* Am. Compl., Doc. 7, #36–44).

After conducting discovery, Spring Grove filed a Motion for Summary Judgment. In that motion, Spring Grove argues that, as a matter of law, Burress cannot establish either: (1) a *prima facie* case for discrimination or retaliation; or (2) that Spring Grove's proffered reason for Burress's termination—her comments to Douthitt and her reactions in connection with the company's investigation of those comments—was pretextual. (*See* Doc. 20). That Motion is currently before the Court.

## LAW AND ANALYSIS

### A.    Standard Of Review.

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy,* 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support

its claim. *Celotex,* 477 U.S. at 324; *Lansing Dairy,* 39 F.3d at 1347. Whether summary judgment is appropriate depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)).

This Court does not have the responsibility to *sua sponte* search the record for evidence creating a genuine issue of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Anderson*, 477 U.S. at 249–50. If the nonmoving party fails to make the necessary showing for an element upon which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

In sum, in light of all the facts as to which Spring Grove shows a lack of dispute, Burress must present some remaining "sufficient disagreement" which would necessitate submission to a jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party—Burress. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.

1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## B.    Burress Has Abandoned Her Discrimination Claims.

Burress brought sex, race, and color discrimination claims, under both state and federal law, against Spring Grove. (*See* Am. Compl. at ¶¶ 46–57, #41–42). But, in her opposition to Spring Grove's motion for summary judgment, Burress elected not to respond to Spring Grove's arguments for summary judgment on those claims. Instead, aiming to "promote judicial efficiency," Burress "limit[ed] her opposition to Defendant's motion as directed to her retaliation claims," and is "not oppos[ing] the motion as directed to her discrimination claims." (Pl.'s Memo. in Opp'n at #896 n.5).

"This [Circuit's] jurisprudence on abandonment of claims is clear: a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) (collecting cases). Accordingly, Burress has now abandoned her federal and state sex, race, and color discrimination claims, and the Court thus GRANTS summary judgment to Spring Grove on those claims.

## C.    Burress's Retaliation Claims Fail As A Matter Of Law.

Burress's only remaining claims are two retaliation claims, one under Title VII and the other under corresponding Ohio law. Title VII (and the corresponding Ohio Revised Code provision[3]) prohibits an employer from retaliating against an employee

---

[3] Ohio courts have held that "[f]ederal law provides the applicable analysis for reviewing retaliation claims" brought under Ohio Revised Code § 4112.02(I) because of the statutes' similar language and origin. *Baker v. Buschman Co.*, 713 N.E.2d 487, 491 (Ohio Ct. App.

16

who has opposed discriminatory conduct. 42 U.S.C. § 2000e-3(a). When, as here, a plaintiff seeks to support such a claim by circumstantial evidence, the *McDonnell Douglas* burden-shifting framework governs at the summary judgment stage. Under that framework a plaintiff must first establish a *prima facie* case for his or her retaliation claim. To do so, a plaintiff must prove "by a preponderance of the evidence" that (1) the plaintiff "engaged in activity protected by Title VII; (2) plaintiff's exercise of such protected activity was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." *Kubik v. Cent. Mich. Univ. Bd. of Trs.*, 717 F. App'x 577, 585 (6th Cir. 2017) (alteration omitted); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 562–63 (6th Cir. 2000); *E.E.O.C. v. Avery Dennison Corp.*, 104 F.3d 858, 860 (6th Cir. 1997). Moreover, as to the fourth prong—causation—the Sixth Circuit has held that the plaintiff must show that engaging in the protected activity was the "but-for" cause of the adverse employment action, not merely a contributing factor. *Adamov v. U.S. Bank Nat'l Assoc.*, 681 F. App'x 473, 477 (6th Cir. 2017).

Here, as more fully discussed below, the Court finds Burress's *prima facie* case falls short on the knowledge and causation prongs. Thus, the Court need not, and does not, consider the other two steps of the *McDonnell Douglas* framework—whether

---

1998); *see also Plumbers & Steamfitters Joint Apprenticeship Comm. v. Ohio Civil Rights Comm'n*, 421 N.E.2d 128, 131 (Ohio 1981) ("[F]ederal case law interpreting Title VII … is generally applicable to cases involving alleged violations of [Ohio Revised Code] Chapter 4112."). Thus, the Sixth Circuit analyzes them together. *See Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 510 (6th Cir. 2016). And so will this Court.

Spring Grove has articulated a legitimate reason for its adverse employment decision, and whether Burress can show that the proffered reason is pretextual.

> **1.** **Balancing The Summary Judgment Standard With The Preponderance Of The Evidence Evidentiary Standard When Analyzing A Plaintiff's *Prima Facie* Case.**

Before turning to a closer examination of the specific elements of the *prima facie* case, a word is in order about how summary judgment plays out in claims, like this one, that are subject to the *McDonnell Douglas* burden-shifting framework. In particular, the Court notes the somewhat uneasy interplay between the "genuine dispute of material fact" and "light most favorable to the non-movant" standards that always apply in summary judgment analyses, on the one hand, and the "prove by a preponderance of the evidence" standard that is often used, as in the cases cited above, in explicating the *McDonnell Douglas* framework.

"Prove by a preponderance of the evidence" is an odd phrasing to employ in describing the analysis at summary judgment. Generally speaking, "preponderance of the evidence" refers to a burden of proof. When a party bears the burden of proving a fact (say "Fact A") by a "preponderance of the evidence," that means the party must convince the jury that it is more likely than not that Fact A is true. In undertaking that inquiry, presumably the jury balances the evidence for and against Fact A, and the jurors collectively determine whether they are persuaded. Importantly, it may well be the case that the evidence would be sufficient to support *either* a finding that Fact A occurred, *or* that it did not. In such cases, the court would not overturn a

verdict for, or against, a given party. As either outcome lies within the bounds of reasonableness, the court will not substitute its judgment for that of the jury.

That notion of preponderance of the evidence, though, does not translate easily to summary judgment. At summary judgment, a court is not tasked with determining whether the court believes it is more likely than not that a disputed fact occurred. Rather, the court's sole job is to decide whether there is a sufficient dispute to warrant a jury determination. That is, the court asks whether, in light of the undisputed facts, when coupled with all disputed facts interpreted in the light most favorable to the non-moving party, any reasonable jury could find in the non-moving party's favor. So, the real question at this stage is not the "preponderance of the evidence" as that phrase is typically understood, but rather whether the record, when read in the light most favorable to the non-moving party, is legally sufficient to support the claim.

The Sixth Circuit's formulation of the *McDonnell Douglas* framework at summary judgment in *Macy v. Hopkins County School Board of Education*, 484 F.3d 357, 364 (6th Cir. 2007) (abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012)), reflects this understanding:

> On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry. Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that a *prima facie* case of discrimination has been established. The defendant must then offer sufficient evidence of a legitimate, nondiscriminatory reason for its action. If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination.

(quotations and citations omitted). The appeals court has used that same formulation in discussing the *McDonnell Douglas* framework in other cases, as well. *See, e.g.*,

*Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) ("[T]he plaintiff must produce 'evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination[.]'") (quoting *Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007)).

Under that formulation, in deciding whether the plaintiff has proven his or her *prima facie* case by a preponderance of the evidence, the court on summary judgment is not determining whether the court finds the record evidence convincing on balance, but rather whether, based on the evidence, when viewed in the light most favorable to the plaintiff, a reasonable jury could find in the plaintiff's favor. This Court finds that this concept of legal sufficiency, not persuasiveness, appropriately controls at the summary judgment stage under the *McDonnell Douglas* framework, and thus that is the approach that the Court employs here.[4]

---

[4] Admittedly, that understanding raises additional questions. For example, it is not entirely clear that the *McDonnell Douglas* framework applies at the trial stage, or how it applies, even in those matters where it controls at the summary judgment stage. *See, e.g.*, *Bilski v. McCarthy*, 790 F. App'x 756, 761–62 (6th Cir. 2019) (discussing the role of *McDonnell Douglas* after a trial on the merits). If the burden-shifting framework does not apply at trial, though, then the Court may be asking a question at summary judgment—whether the jury could reasonably make a finding that the plaintiff established his or her *prima facie* case—that the jury will not in fact be called upon to make at trial. Indeed, in *Bilski*, the Sixth Circuit stated that the trier of fact (there, a judge, as it was a bench trial) "should not … revisit[] whether [the plaintiff] established a prima facie case …." *Id.* at 762. The observation that "revisiting" is prohibited is odd for another reason, as well. Under the approach outlined above, the only finding that a court has made *before* trial is that there is sufficient evidence from which a reasonable trier of fact *could find* that the plaintiff had established his or her *prima facie* case. If that is so, however, asking the trier of fact to answer the question of whether the plaintiff *has actually established* his or her *prima facie* case of discrimination by a preponderance of the evidence (under the typical more-likely-than-not understanding of that term) would not appear to be "revisiting" a prior determination (as the prior determination asked a different question). For purposes of resolving the present motion, though, the Court need not reach the question of how the *McDonnell Douglas prima facie* case requirement applies at trial.

> **2.      Burress Fails To Create A Genuine Dispute Over Whether The Decisionmakers Here Knew About Her Alleged Protected Activity.**

With that out of the way, the Court turns to analyzing the *prima facie* case on the record here, beginning with the knowledge element. To satisfy the knowledge element of a *prima facie* case of retaliation, the plaintiff must show by a preponderance of the evidence, as that term is described above, that the decisionmaker knew, at the time he or she imposed the adverse employment action, that the plaintiff had previously engaged in protected activity. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 832 (6th Cir. 1999). "[D]irect evidence of such knowledge or awareness is not required, and … a plaintiff may survive summary judgment by producing circumstantial evidence to establish this element of her claim." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002). Here, though, the Court concludes that, while it is perhaps a close call, even taking the evidence in the light most favorable to Burress, and drawing all reasonable inferences therefrom, she has failed to provide sufficient evidence to show that the three employees who made the decision to terminate her— Brown, Burke, and Deshler—knew that she had engaged in protected reporting activity at the time that they reached the adverse employment decision.

To start, all three decisionmakers testified under oath that they had no knowledge that Burress had reported the alleged 2015 harassment at the time they decided to fire her. (*See* Burke Dep. at #540–41; Brown Dep. at #381–82; Deshler Dep. at #590–91). Burress does not have any direct evidence to contradict that testimony (e.g., an email to human resources reporting Kelley's alleged behavior, or her own testimony that she told human resources of it, or any other document reflecting that

21

the human resources department (or frankly anyone) had knowledge that Burress had reported Kelley's alleged conduct).

Without direct evidence that the decisionmakers had such knowledge, Burress instead relies on circumstantial evidence that the decisionmakers knew that she had engaged in this protected reporting activity. She claims that this circumstantial evidence is present through a combination of Spring Grove's required reporting rules (under which supervisors are required to report instances of sexual harassment of which they become aware), coupled with her supervisor's testimony (i.e., Koma) that he always followed the reporting rules whenever he became aware of reportable behavior. (*See* Pl.'s Memo. in Opp'n at #897–98). As further discussed below, however, her argument falls short on the record here.

The key witness in all of this is Koma, Burress's supervisor. Burress maintains she told Koma about the encounter. (*See* Burress Dep. at #111, 118–20). He testified that he cannot recall Burress doing so, (*see* Koma Dep. at #766, 769), but that he does "vaguely remember [Kelley] being the context [sic] of text messages" around the time of the alleged incident, (*see id.* at #765). Thus, if the question were merely whether Burress had reported the incident *to Koma*, the appropriate resolution at summary judgment would be straightforward. Even though Burress did not produce any other evidence corroborating that she did so (e.g., copies of the text messages she says she sent Koma), Sixth Circuit precedent holds that Burress's testimony alone is sufficient to create a genuine dispute. *See Moran v. Al Basit LLC*, 788 F.3d 201, 206 (6th Cir. 2015) ("Despite the lack of corroborating evidence, Plaintiff's testimony is sufficient

to create a genuine dispute of material fact that forecloses summary judgment at this juncture."). In other words, drawing all reasonable inferences in Burress's favor, a reasonable jury could conclude Burress reported the alleged sexual harassment to Koma in 2015.

But that is not the end of the story. Koma was not a decisionmaker in Burress's termination. And, here, the question is whether there is sufficient evidence that the decisionmakers *themselves* were aware of her having reported sexual harassment. She does not claim that she told human resources in 2015, (Burress Dep. at #120), and she concedes that she was cut-off from telling her story during the meetings leading up to her termination. (*See id.* at #116–17). Thus, there is no evidence of Burress herself reporting the alleged harassment to human resources (which, of course, would have made human resources aware of her reporting activity).

The sole remaining question then is whether there is evidence that Koma relayed Burress's reporting activities to human resources. Burress claims that a jury could infer that happened. More specifically, she argues that, while Koma does not recall her reporting to him that Kelley harassed her, Koma does concede that Spring Grove's rules for supervisors would require him to report to human resources any sexual harassment allegations of which he became aware. (Koma Dep. at #760). Thus, Burress argues, if Koma followed protocol like he says he does, (*see id.* at #774–75), and if she reported the alleged harassment to Koma (which is a disputed fact that the Court must resolve at this stage in her favor), then a reasonable jury could infer he followed protocol after she reported the incident to him. As this protocol would require

Koma to report the accusation to his supervisor (Burke) and the head of HR (Brown), (*see* Freytag Dep. at #706; Brown Dep. Ex. 17, Doc. 16-5, #434), that means those two (who were two of the three decisionmakers) would have been aware of her reporting activity at the time of their termination decision some eighteen months later.

There is a bit of a problem with this theory, though: Burress herself explicitly testified that Koma never reported the incident to HR. (Burress Dep. at #120). Likely recognizing that her own deposition testimony undercuts her argument that Koma had passed her reporting activity along to human resources, Burress later submitted a declaration in which she claimed that "regardless of whether [Koma] reported to Human Resources, [Koma] was going to report it to Pam Deshler." (Burress Decl. at ¶ 3, #884). "Mr. Koma often told me he shared everything with Ms. Deshler," Burress explained. (*Id.*). That is, if Koma tells Deshler everything—like he purportedly told Burress he does—then a reasonable jury could conclude that he reported the incident to Deshler (who was a decisionmaker). (*See* Pl.'s Memo. in Opp'n at #897–98).

But that approach falls short for other reasons. First, Deshler denies knowing about Burress's allegations against Kelley until after Burress was fired. (*See* Deshler Dep. at #590–51). Second, Burress's statement that Koma supposedly "was going to report" to Deshler, because he "shared everything" with her, was speculation. And to the extent that Burress is claiming that Koma explicitly told Burress that he was going to report it to Deshler, Burress runs into another problem—the hearsay rule. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed.

R. Evid. 801(c). Burress offers Koma's statement that he would report the incident to Deshler for the truth of the matter asserted—that is, to show that Koma *did* report the incident to Deshler. Such "[h]earsay evidence may not be considered on summary judgment." *Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999). Thus "absent a showing of admissibility—and none was forthcoming here—[Burress] may not rely on rank hearsay[.]" *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir. 1990).

Nor can Burress escape this result by relying on the exception to the hearsay rule in Federal Rule of Evidence 801(d)(2)(D) for statements made by a "party's agent or employee on a matter within the scope of that relationship." This exception would apply, for example, to an alleged statement by Koma that he would report (or at least that he had reported) the matter to human resources. Presumably, as Burress's supervisor, such reporting would fall within his official duties, and his alleged statement to Burress that he would perform that official duty would thus be non-hearsay under this evidentiary rule. But that does not help Burress here because, as noted above, while she claims Koma *said* he would report the incident to human resources, she also testified that Koma did *not* in fact do so.

As for Koma's alleged statement to Burress that he would "report the incident" to Deshler, the hearsay analysis is a little different. There is nothing in the record that suggests that, in doing so, Koma would be engaging in some official intra-corporate reporting function. Rather, Burress appears to contend that Koma would

share "everything" with Deshler as a friend.[5] Accordingly, any statement by Koma about sharing with Deshler would not constitute non-hearsay under Rule 801(d)(2)(D), as any "reporting" to Deshler was not being done "within the scope of" Koma's employment responsibilities.

In sum, all three decisionmakers explicitly testified under oath that they were unaware that Burress had previously reported Kelley's alleged conduct at the time that they decided to fire her. Burress has no documentary evidence or direct testimony to the contrary. And the circumstantial evidence she advances fails to create a genuine dispute as to whether their testimony in this regard is untruthful. Absent evidence supporting a finding that the decisionmakers knew that Burress had engaged in protected activity, or at least creating a genuine dispute on that front, she fails to prove a sufficient *prima facie* case, and thus summary judgment is warranted.

### 3. Even If Burress Could Create A Genuine Dispute Over Knowledge, Her *Prima Facie* Case Still Fails Under The Causation Element.

Burress separately falls short on the fourth prong of the *prima facie* retaliation case under *McDonnell Douglas*. That is, she has failed to identify any evidence that

---

[5] While at the time of the 2015 incident it appears that Deshler may have been Koma's boss, (*see* Koma Dep. at #753), Burress never argues that Koma had a corporate responsibility to report sexual harassment to Deshler. If he did have a responsibility to report to her, then Koma's statement to Burress that he would report the incident to Deshler *would* be considered admissible hearsay under this exception. But Burress never makes that argument. To the contrary, Burress instead argues that Spring Grove's reporting policy required Koma to report to *Burke*, the next level up from Deshler. (*See* Pl.'s Memo. in Opp'n at #897). Spring Grove's CEO (Freytag) likewise testified that Koma's reporting obligations would have been to Burke and Brown. (Freytag Dep. at #706). As to Deshler, Burress seems to suggest that Koma shares everything with Deshler because of their friendship, rather than some corporate responsibility.

would support a jury finding that her engagement in protected activity—i.e., reporting sexual harassment—was the but-for cause of her termination.

The Sixth Circuit has noted that the burden of establishing a *prima facie* case in a retaliation action is not onerous, and indeed is "easily met." *Nguyen*, 229 F.3d at 563. Still, a plaintiff must establish but-for causation at both the *prima facie* and pretext stages of the *McDonnell Douglas* framework. *See E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767, 770 (6th Cir. 2015); *Adamov*, 681 F. App'x at 477. Doing so "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013).

Sometimes, of course, an adverse employment decision rests on multiple factors. The Sixth Circuit has also explained how but-for causation works in that setting. When a retaliation case involves an adverse decision that rests on a combination of "tainted" and "untainted" factors, the plaintiff "cannot establish liability" if the "untainted factors" in and of themselves would be "sufficient to justify the ultimate decision." *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 428–29 (6th Cir. 2014) (citing *Nassar*, 570 U.S. at 383–84 (Ginsburg, J., dissenting)). Rather, if the "untainted factors" are "sufficient to justify the ultimate decision," then the defendant is "entitled to summary judgment." *Id.*

That standard dooms Burress's efforts to establish causation for purposes of avoiding summary judgment here. The undisputed facts show that Burress violated the harassment policy and that this was at least one reason for her firing. Testimony

27

from Brown (the head of HR) confirms this. (*See* Brown Dep. at #391). The only "evidence" to the contrary is Burress's *argument* that the standard for harassment is subjective and that she did not believe that her comments were offensive. (*See* Pl.'s Memo. in Opp'n at #901–02). But the person to whom the comments were made (Douthitt) believed that they were. (*See* Douthitt Dep. at #233–34, 248–49). And there is no indication in the record evidence anywhere that those involved in the decision-making process did not likewise find the comments offensive. In fact, there is evidence to the contrary. (*See, e.g.*, Deshler Dep. at #559–60 (testifying that she considered Burress's comment to be racially inappropriate)). Thus, even reading the facts most favorably to Burress—and even crediting her argument that the decisionmakers had knowledge that Burress had previously engaged in protected reporting activities—at most, this is a case where the decision may have been based on a combination of "tainted factors" (i.e., retaliation for reporting) and "untainted factors" (i.e., disciplining Burress for her second violation of the co-worker harassment policy).

Given the existence of an untainted factor, to escape summary judgment, Burress must show that this untainted factor, in and of itself, was not sufficient to warrant termination. *See Seoane-Vazquez*, 577 F. App'x at 428–29. Put differently, Burress must show that absent her having allegedly engaged in protected activity, she would not have been fired. *See Nassar*, 570 U.S. at 360–62. She cannot do so.

She first seeks to make the necessary showing by claiming that her Band-Aid comment was not severe enough to warrant termination. But that is mere speculation on her part, and cannot create a genuine dispute in light of the unanimous testimony

from the actual decisionmakers, as noted above, that it was—testimony that is unrebutted by any documentary or direct evidence suggesting that they are being less than truthful.

Burress next tries to argue that similarly situated individuals violated the same harassment policy, yet were not terminated. That would perhaps help her case, but she fails to identify a workable example to illustrate her point. The only example she offers in her brief is Spring Grove's CEO. According to Burress, the CEO, "who gave the 'go ahead' to terminate [her], and who as an employee of Defendant[,] was subject to the same 'harassment policy,' repeatedly sent employees of Defendant jokes that by any objective measure were far more 'insensitive' and 'offensive' than [her] band-aid joke." (Pl.'s Memo. in Opp'n at #902). But Spring Grove's CEO is not similarly situated to Burress, *see Campbell v. Hamilton Cty.*, 23 F. App'x 318, 325 (6th Cir. 2001), so even if her characterizations of his emails are correct, the failure to terminate the CEO for such behavior would not offer sufficient evidence that her termination was retaliatory.

Lastly, Burress seems to argue Brown "had it in for her," and fired her because he and Kelley were friends. (*See* Pl.'s Memo. in Opp'n at #899). Presumably, the argument is that, because they were friends, this would support a finding that Brown wanted to "punish" Burress for reporting on Kelley. But the problem with that is, for the reasons discussed above, there is no evidence indicating that Brown knew about the alleged harassment, and certainly not that he knew about Burress reporting it, and therefore Brown would not have known to punish Burress for that (unknown to

29

him) reporting activity. Moreover, even apart from that, here there were three decisionmakers (and approval from a fourth, Freytag), and this argument does not provide any evidence that Brown's illicit motive (if any) would have been shared by the other two.

In sum, on the record evidence here, the Court finds that Burress has failed to create a genuine dispute as to whether the "untainted factor" was "sufficient to justify the ultimate decision." *Seoane-Vazquez*, F. App'x at 428–29. The Court thus concludes Spring Grove is "entitled to summary judgment" on the causation prong. *Id.*

## CONCLUSION

Based on the foregoing, the Court finds that Burress has abandoned her discrimination claims and has failed to establish a *prima facie* case of retaliation. Accordingly, the Court **GRANTS** Spring Grove's Motion for Summary Judgment (Doc. 20) and **ORDERS** the Clerk to terminate the case.

**SO ORDERED.**

June 5, 2020
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**